## COLBERT v. McCLEARY.

(Supreme Court, Appellate Division, Second Department. January 10, 1913.)

WILLS (§ 745*)—ASSIGNMENT BY LEGATEE—FRAUD—EVIDENCE.

Evidence *held* not to show that a contract assigning plaintiff's interest as the residuary legatee in an estate was obtained by fraud or over-reaching.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1918–1933; Dec. Dig. § 745.*]

Appeal from Special Term, Kings County.

Action by Patrick J. Colbert against Philomena Freel McCleary. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.

Argued before JENKS, P. J., and HIRSCHBERG, BURR, WOODWARD, and RICH, JJ.

Louis Dean Speir, of New York City (Newell Martin, of New York City, and Talcott H. Russell, of New Haven, Conn., on the brief), for appellant.

Augustus Van Wyck, of New York City, for respondent.

WOODWARD, J. The controversy grows out of substantially these facts: Edward Freel, a resident of Brooklyn, died about 16 years ago, leaving a last will and testament, which was duly admitted to probate, and letters testamentary were issued to Edward F. Freel, Francis J. Freel, and Catherine Freel, the executors named in such will. Edward and Francis J. Freel were sons of the testator, and Catherine Freel was his widow. His only other child was Philomena Freel McCleary, the defendant in the present action. Francis J. Freel was a doctor, and we will hereafter refer to him as Dr. Freel. The will of Edward Freel left his entire estate to his widow during her natural life, "and after her death, to my children Edward F. Freel, Francis J. Freel and Philomena Freel, to be equally divided between them, share and share alike." It was further provided that:

"In case of the death of any of my said children before my wife, leaving him or her issue surviving, then the share of said child so dying to go to said issue and in case of the death of any of my said children before my wife without issue, then the share of said child so dying to go to the survivors of my said children, share and share alike."

Edward F. Freel died intestate, unmarried, and without issue on the 22d day of March, 1902, about six years after the death of his father, and Dr. Freel, the second son, died about 10 years after the decease of his father, unmarried and without issue, at Stony Creek, Conn. Dr. Freel left a last will and testament, which was duly admitted to probate in the state of Connecticut, and by the terms of this will he left all of his property, "both real and personal, of whatever kind or nature, to the said Patrick J. Colbert absolutely." Patrick J. Colbert, the beneficiary under the will of Dr. Freel, is alleged in the complaint to have been employed by Dr. Freel "as an attendant and companion, the two residing together at the residence at Stony Creek

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

hereinbefore described, and that the relations between them were extremely friendly and confidential," and this allegation is particularly admitted by the answer, and fits in but poorly with the contention on the trial that the plaintiff, this same Patrick J. Colbert, the companion and intimate friend of Dr. Freel, was a man with no education, and little better than an ordinary village roustabout. When the will of Dr. Freel was offered for probate, it was contested by Mrs. McCleary, the defendant in the present action, but was finally admitted to probate, and the plaintiff acquiesced in the payment of a counsel fee of $3,500 by the executor. It subsequently appeared that the estate of Dr. Freel, so far at least as it could be reduced to present possession, was not sufficient, after paying counsel fees and other expenses, to pay the debts of the deceased, so that Mr. Colbert, up to the time of the transaction out of which this litigation grew, had realized nothing from the attempted gift under the will, and he had been engaged in various positions since the death of Dr. Freel in and around Stony Creek and in the borough of Brooklyn for which he had received his board and clothes and small sums of money, and it is easy to read between the lines that he had fallen into dissipation, and was drifting. While he was still residing at Stony Creek, and while living in the precarious way mentioned, though evidently not in distress or in any pressing need, Mrs. McCleary, accompanied by Matthew O'Malley who is described by the plaintiff as "her agent, adviser, and secretary," and Matthew A. Reynolds, her lawyer, and a relative by the name of Gray, visited that place, evidently for the purpose of looking over some of the property belonging to the estate of Edward Freel, deceased, through which a new trolley line was being constructed. It does not appear that they were looking for Colbert, but he was near the railroad station when they arrived, and, being acquainted with all of them, he was called over to where they were by the local driver of the omnibus, and afterward accompanied the party upon a trip to look at the property. Subsequently he was asked to go to New Haven, which he did; his fare being paid by O'Malley. The party went to the office of Reynolds, Mrs. McCleary's counsel, where Reynolds stated to Colbert that Mrs. McCleary was disposed to do something for him. After a general statement, during which Reynolds asked the plaintiff if he had made any assignments of his claims under the will of Dr. Freel, and was assured that he had not, Colbert and Mrs. McCleary took up the matter of an assignment of his interest in the estate of her brother and father. She offered Colbert $3,000, which he refused to accept. She subsequently made an offer of $5,000, to be placed in a trust fund to yield Colbert the sum of $35 per month so long as the fund and its interest would afford this amount, with any remainder of the sum to be available to his heirs in the event of his death. This offer Colbert accepted, said he was satisfied with it, and, upon being asked by Reynolds if he felt competent to close the transaction alone, he replied that he did, and Mrs. McCleary made and delivered her check to Reynolds, under the terms of a written agreement constituting a part of the complaint, for the sum of $5,000; it being understood and agreed that Reynolds was to find a savings bank which would pay the largest possible income upon the fund dur-

ing the time that it was to be held. This agreement clearly contemplated the fact that Colbert had, or might have, some interest in the estate of Edward Freel, deceased, for it recited that:

"Whereas the said Patrick J. Colbert is named as residuary legatee and devisee in the will of Frank J. Freel, late of said Branford and said Brooklyn, deceased, administration upon said estate still pending. Now, therefore, it is agreed the said Patrick J. Colbert in consideration of agreements hereinafter contained hereby sells, assigns and conveys to the said Philomena McCleary any and all interests and rights, claims and demands in or to the estate of said Frank J. Freel, and in or to the estate of Frank J. Freel's father Edward Freel, late of Brooklyn, deceased, in or to any and all property real and personal belonging to said estate of Frank J. Freel or said estate of Edward Freel aforesaid."

Then followed the provision for the placing of the $5,000 in such a manner as to enable the plaintiff to draw it out at the rate of $35 per month, and there is no question that the defendant gave her check for the purpose to the party designated, and that everything was done which the defendant was to do to complete her part of the transaction, it being established that she had funds for the payment of such check, and the transaction was not completed in its details, evidently because the plaintiff announced within a few days that he would not sign the necessary papers for the releasing of possible claims upon real estate, and that he elected to rescind his contract.

The theory on which this action is brought is that the plaintiff has some interest in the estate of Edward Freel, deceased, through the will of his son, Francis J. Freel, and that, in some manner, the plaintiff was overreached in the transaction under which he released his claims. Colbert does not claim that there was any active fraud, does not claim that he was in any manner coerced. His testimony as to what occurred just prior to and at the time of the closing of the contract is in entire accord with the testimony of the defendant's witnesses. There is not the slightest evidence that any one interfered with the conversation between Mrs. McCleary and the plaintiff in reference to the contract; and that the plaintiff is not the weakling he would have us believe is plainly evidenced by the fact that he entered fully into the discussion, and declined an offer of $3,000, a considerable sum of money to be rejected by a man who was living on odd jobs and in distress. When the offer was raised to $5,000, he accepted it, and he accepted the conditions of its payment; said he was satisfied. Great stress is laid upon the alleged fact that neither Mrs. McCleary nor her attorney told the plaintiff about the amount of the estate of Edward Freel, but the contract between the parties distinctly referred to such estate, and the plaintiff concededly read over the contract, and it does not appear that he thought it worth while to make any inquiries about it. Certainly, as the residuary legatee under the will of Dr. Freel, after a contest over the probate of such will, he was in as good a position to know of the estate generally as the defendant, who was not an executor, and, if he did not think proper to ask for information about the estate, why should the defendant have volunteered to tell him anything? There is nothing to indicate that she had any information which was not equally available to the plaintiff. The estate was large, it is claimed to be from $500,000 to

$1,000,000 or more, and it is absurd to say that the residuary legatee of the son of Edward Freel, 16 years after the death of Edward Freel and 4 years after the death of his supposed benefactor, did not have all of the information which was necessary to the proper carrying out of the contract here under consideration, or that he was not in as good a position to know the facts as the defendant. She was not occupying a fiduciary relation. She was merely a beneficiary under the same will through which the plaintiff claims, and if he saw fit to release a claim, which is unquestionably open to grave doubts, for a consideration of $5,000, we can see no possible reason why he should be permitted to rescind the contract. The estate of Edward Freel, deceased, is incumbered with a life estate. Nothing could come to the plaintiff until this was at an end under any circumstances. While the widow is about 75 years of age, she may, for all that appears in the record, be of sound health and liable to live for years, and, as the learned court at Special Term suggests, it is not at all certain that he has not made a good bargain. Many men of good business abilities would prefer $5,000 to a chance to litigate a claim for a much larger sum, and especially where, as in the present case, sound lawyers have advised that the plaintiff has no claim under the will, and there is the intervening life estate to be reckoned with.

The case of Wheeler v. Smith, 9 How. 55, 13 L. Ed. 44, determined on demurrer, where the estate was attempted to be given to a charitable trust which the court could not sustain, and the heir at law was permitted to hold the property in spite of the fact that he had compromised the claim with the executors, is not in point. There he was advised by lawyers of high standing, one of whom was an executor of the will, that the trust was valid, and relying upon this assurance, and to avoid litigation, the heir at law had compromised the claim for $25,000. The executor stood in a fiduciary relation to the plaintiff in that action, and he was bound to show that the transaction was fair. While the court admitted that there was no intention of defrauding the plaintiff, upon the well-established rule which requires of one in a fiduciary relation to deal properly with the beneficiary, the plaintiff was permitted to repudiate the contract. But that is not this case, and there is no authority with which we are familiar which permits a contract made between competent persons, without fraud or duress, to be rescinded in the manner here attempted.

The judgment appealed from should be affirmed, with costs. All concur.